Mr. Kachurgas, I hope I'm pronouncing it correctly. You've got it correctly, your honor. Okay, go right ahead. May it please the court, Matthew Kachurgas on behalf of appellant Joann Cooper, this case arises from the grant of summary judgment in favor of the Jacksonville Sheriff's Office on plaintiff's claims arising under Section 1983 for a violation of Ms. Cooper and her minor child's violation of their Fourth Amendment and Fourteenth Amendment substantive due process rights as well as the supplemental claims under Florida law. The principal issue we raise on appeal is the district court's error in finding that no Fourth Amendment seizure occurred in this instance. And the facts of the case are accurately portrayed by the district court as sobering and heroic with the heroism demonstrated by my client, appellant Joann Cooper. On the afternoon of March 28, 2010, Ms. Cooper had picked up her two children, the two-year-old son for whom she's pursuing the claims as well as her seven-year-old daughter that miraculously was not shot in this incident. But she picked up the two children from school and took them through a fast food restaurant on a busy thoroughfare here in Jacksonville. Unbeknownst to her, at a neighboring location right next to the fast food restaurant, a bank robbery, an armed bank robbery had occurred. The suspect had fled the bank and was traveling down the road when he got to the restaurant that neighbors the bank and came up upon Ms. Cooper through the drive-thru line at the restaurant. Ms. Cooper was waiting on food for herself and her children when the suspect suddenly and unexpectedly approaches her car window with the firearm and demands that she give him the car. She was willing to do so provided the suspect allowed her to get the children from the car. He was not willing to do so and the struggle ensued with Ms. Cooper and the suspect over the firearm being brandished by the suspect. Ms. Cooper was able to wrestle the firearm away from the suspect and it ended up on the passenger side floorboard. At this time, the police, the Jacksonville Sheriff's Office, were responding to this call and one of the officers, Lieutenant York, came from behind the car tracking the suspect from the bank and was utilizing a shotgun. At the time, there was a struggle between Ms. Cooper and the suspect. Lieutenant York discharged his shotgun twice into the open door sweep of the car while the struggle was occurring. At this point, the suspect wrestled his way into the car sitting in the lap of Ms. Cooper trying to leave the drive-thru line. Realizing that the vehicle was about to engage and to move, York fired two more rounds from the shotgun into the rear tires of the vehicle attempting to disable it. While that was going on, a number of other officers responded and set up a sort of perimeter on the roadway around the fast food restaurant. None of them blocked the exit, but they all set up the perimeter and officers began shooting into the vehicle. Officer Black, who was a six-year veteran of the force at the time and was a field training officer for another officer that discharged six shots, Officer Griffith, Black ended up shooting 24 times in the incident. He unloaded his first clip with 13 rounds. At the time, the vehicle was stationary in the drive-thru line all through the front windshield of the car and the record evidence and the photographic exhibits show that these shots through the windshield were all at the passenger compartment of the car. Other officers began firing at the vehicle as well. Ms. Cooper, at the commands of the suspect of move, lifts her foot off of the brake and at this point she had been struck in the foot by one of the shots. One of the officers opined it was a shotgun, but I don't know that anyone knows. The vehicle began to move. Officers continued to fire at the vehicle, both through the front windshield and as the vehicle passed through the passenger side. Tragically, Ms. Cooper, as indicated, was shot in the foot, but more tragically, her two-year-old son, buckled into his car seat, was shot through the chest and through the arm. Ultimately, the vehicle lurches across the road. It wasn't speeding. It was slowly moving into the roadway. When it stopped across the roadway and it hit the curb, the suspect attempts to exit the vehicle, and as he's getting caught up in the seat belt, officers converge and fire a volley of shots with the vehicle as its backdrop, striking the suspect and killing him. In light of those facts, Ms. Cooper is filed suit with her claims under 1983 and state law claims. The case proceeded through discovery. After the motion to dismiss, it was granted in part by the district court, excusing a number of officers. Mr. Kierkegaard, you don't have much time, and I think we're pretty up-to-date with the procedural history and the fact of the case, so my suggestion is that you dive into some of the arguments you presented on appeal or else you're not going to get to them. Well, we contend that the district court erred in finding that there was no Fourth Amendment seizure, and the district court's rationale for that finding was that the officers did not intend to shoot anyone other than the suspect. Well, we contend that the officers' subjective intent as to who they intended to shoot is immaterial for the Fourth Amendment analysis. It is whether the officer intended to use the force employed, the discharge of a firearm, that is the only intent of the officer that matters, deriving from the case of Brower v. County of Inyo from the Supreme Court that talks about whether a seizure occurs is whether a force intentionally applied by the officer. We contend the district court erred by morphing that analysis into the subjective intent of the officer as to whom he intended to shoot, which is irrelevant for Fourth Amendment jurisprudence. Now, there are... I tend to agree with your position, but there are a number of cases from other circuits which have come out contrary to the arguments you are making, right? Yes, there is. We contend that they're in error. Well, tell me why you think they're wrong. Because they rely on the subjective intent of the officer as to who they intended to shoot as opposed to the intentional act of the seizure, the discharge of the firearm. The subjective intent of the officer as to who he intended to seize is irrelevant. It's the manner in which he's intending to seize is the intentional act of the officer that's relevant under Brower. Thus, when the officer discharges the firearm, and he does so intentionally, those that are subject to harm as a result of that discharge have standing, for lack of a better term, to raise a Section 1983 Fourth Amendment violation claim. It doesn't matter that he intended to shoot somebody else and happened to strike the hostage that was in the vehicle. It was an intended and foreseeable consequence of the discharge of the firearm. Just because he missed the target doesn't eliminate the claim. It's whether that shot, the shots being fired, were objectively reasonable. And in this case, they were not because of the presence of the three hostages that were there as well as the backdrop of the Wendy's. The use of force in this case, the intentional discharge of the firearm that struck two of these hostages, gives rise to a Fourth Amendment claim. And the district court erred in finding that it did not. Mr. Chair, Judge Choklat, as I understand your argument, there would be a seizure in any setting like this. Say an apartment where a man had a woman around the throat and a gun. And he's firing the gun. And they try to take him down. Your argument would be that the woman would be, that she was seized by the officers. Is that right? Correct. Okay. So you always have a Fourth Amendment violation. Well, let's put it this way. You always have an argument in whether what the officers were doing, how they were trying to handle the situation, was unreasonable because there was a seizure and the woman got hurt. And it may very well be that the actions of the officer were reasonable. And then that could – That's right, but there's a Fourth Amendment claim, though, your argument is. Once the officer intentionally discharges that firearm and it results from the subjective intent – Well, even if the officer is threatening to discharge the firearm, in my hypothetical you have the man with the gun. And at that point there is a Fourth Amendment seizure. I don't know that if he's aiming the gun per se. It may not be unreasonable, but she's seized. Well, I don't know if the pointing of the gun is a seizure. Well, if the officers are holding the gun, they're 10 feet away and they're like Siamese twins and the officer's holding the gun. Well, your argument has to be that there's a seizure. The question is whether it's unreasonable. Well, in that fact pattern, Your Honor, it could be that it's an attempted seizure as opposed to a seizure, but undoubtedly at the point that the officer fires the weapon and the bullet strikes – An attempted seizure requires some kind of intent. An intent to use whatever – An attempted seizure would require criminal intent, would it not? I don't know about criminal intent. Criminal intent to seize the person. Well, forget criminal intent. You have specific intent to seize the person. Well, our argument is the intent intentionally – The intent that's relevant for the seizure analysis is that of the person confronted with the law enforcement officer's conduct. Would a reasonable person be free to terminate the encounter? So in that situation, the hostage may very well know that it's not being directed at her and feel free to leave the situation. In this situation with Cooper confined to a vehicle with shots being fired and coming through the windshield, there's no way that she felt like she could terminate that encounter. Did the seizure occur prior to the firing of the shots by Banks? I would say no. No. It only occurred when he fired the shots. Is that your argument? Our argument is from the reasonable person in Ms. Cooper's situation. No, no, no. When did the seizure occur? At the time the shots were fired at the vehicle. Isn't the correct answer that the seizure occurs when they're hit? Because that's when they're stopped. And that's when Brower kicks in because Brower says, and I'm quoting, a seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful. It's enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place to achieve the result. I thought your argument is or was that when they were hit by the bullet, there was a seizure. Forget attempt. Yeah, unquestionably they're seized when they're struck by the bullet. I mean, why do you need to go to attempt? We don't. She was struck by the bullet. I was attempting to respond to Judge Choflat's question. In any event. This is Judge Hull, and help me with troop, which is our precedent, and it says to have the seizure it requires that intentional intervention directed at a specific individual. I think we all agree they were trying to detain the robber here. That's where the intent got to be specific, not subjective intent, but the need to be intervention and intention directed at a specific individual. I don't know about what Judge Jordan's reading. I'll have to read that. But I thought the seizure had to be at a specific individual. Here they were trying to seize the robber. Well, our argument is the intention of the officer is immaterial. It's the force that's intentionally applied. But in troop, as Judge Choflat well knows, the fact pattern was that the driver was shot and ended up wrecking the vehicle thereafter. So the seizure you couldn't pin necessarily to law enforcement. There was the intervening driving of the suspect driver that resulted in the accident that caused the terminus of the chase and the injuries to the suspect. So in troop there wasn't even a law enforcement seizure because it was the actions of the suspect. Let me state it another way. I thought the seizure had to be directed at a specific individual. That was the finding of the district court with which we take issue. And we contend that it isn't the officer's subjective intent as to who he intended to take down with his shot. It's the intent to use that force that consequences flow therefrom, even if he hits an unintended target, as Judge Jordan has pointed out in the Brower opinion. And this was confirmed in the Brenlin opinion, upon which we rely, that although a criminal case talks about when the driver of a vehicle is stopped, the passengers are seized as well. And it talks about the relevant subjective intent is that of the person being seized. In this case, Ms. Cooper. Would she feel free to terminate the encounter? And with the number of officers and the fuselage of shots coming through the vehicle, she would not feel free to terminate the encounter. Indeed, she was shot. And so at that point, there's a seizure. And we contend that both Ms. Cooper and her minor child have stated a claim for a Fourth Amendment seizure. And due to the facts of the case, the seizure was unreasonable. And that pertains to innocent passengers being in the vehicle that given the fuselage of shots that was occurring, were undoubtedly and not surprisingly struck the hostages. The backdrop of the firing being a fast food restaurant at three in the afternoon when school's letting out. A number of cars on the roadway, two of which were shot by bullets from this episode. And the totality of the circumstances for Fourth Amendment analysis dictate that this was an unreasonable seizure. Okay. You only have the sheriff left in the case. Tell me the cause of action against the sheriff and what you have to show. We contend that there exist genuine issues of material fact. The district court did not reach this finding that there was no constitutional violation. But we contend genuine issues of material fact exist so as to permit this case to go to a jury. I know, but is this a custom and practice claim against the sheriff? What type of claim are you making? The sheriff wasn't on the scene, right? Correct. It's a failure. Indeed, he wasn't even the sheriff when this occurred. This claim arises from what we contend is a failure to train in a manner that's so obvious that it's going to impact adversely the rights of the citizens with whom the JSO encounters. There was virtually no training as it pertains to shooting and hostage situations. They had in their deadly force policy, directing it, deadly force as it pertains to this incident provided that the officers are to use reasonable caution to unnecessarily endanger lives of bystanders considering the backdrop, bystanders, and location. That was just the general deadly force policy to exercise reasonable caution so as to not unnecessarily endanger people. However, when it comes to dealing with hostage situations, there was no policy dealing with shooting. With the prevalence of carjacking and innocent persons being in vehicles that are being pursued, there was nothing to guide the officers in their discretion on whether to employ deadly force, under what situations to employ deadly force. It resulted in a number of officers discharging their weapon 42 times into a vehicle that's occupied by three innocent civilians with a fast food backdrop. And there was nothing to constrain the officers in whether to use force in these instances and the Sheriff's Office failure to train on that point was the moving force that caused this incident. And you have other aspects of the incident that demonstrate the failure of the Department to adhere to the stated policy. We've presented in the record training materials from approximately 10 months prior to the incident where they had training on how to handle crisis situations. Now, the city contends that it was something to do with the SWAT team and we do not. It was training generally applicable to the entire department, supervisors, and officers. And within that training material, it states that... I don't know if you've responded to the question, with the nature of the cause of action. I understand it. Now, thank you. You're welcome. But to finish the point, it says shotguns are not permitted. Not only was one officer discharging a shotgun four times, another one had one at the ready but didn't shoot, recognizing the danger inherent in this situation. But there's other more minutiae facts that we contend establish a policy of the Sheriff's Office due to its failure to train that was the moving force in this case. Likewise, we also contend that there was a 14th Amendment substance of due process violation. The district court found on the motion to dismiss that the allegations, which were borne out by the facts, shocked the conscience of the court. That officer that was denied qualified immunity at the motion to dismiss phase was ultimately dismissed out on his appeal. But the fact remains that the facts of this case shock one's conscience. When reviewed in its totality, the officers' overwhelming... What's your best case for a substance of due process violation here? That's a tough one, Your Honor. I mean, it all springs from... Where is it, then? The Sacramento v. Lewis. I concede that this is a tough road to hoe. Okay. We do have some evidence, though, that the officers intended to cause harm to Ms. Cooper. When the incident was over, it appeared that officers were about to place her under arrest. When one of the officers saw her shot in the foot, he tells another officer, let her walk. So there's evidence that they believe she was a suspect, and the shooting was intended to cause her harm, which would establish liability under Sacramento v. Lewis for an intent to cause harm above and beyond the seizure itself. But I do concede that's a tough road for us to hoe. And I'll reserve the remainder of my time for rebuttal unless there's further questions. All right. Thank you very much. Mr. Fizer. Good morning, and may it please the Court, Craig Cesar with the City of Jacksonville on behalf of the Sheriff. The District Court should be affirmed in this case really for three reasons, and first and foremost, what the District Court did hold was that there was no Fourth Amendment seizure under these facts. And I understand that opposing counsel is talking about the Brouwer case and arguing that Brouwer focuses pretty much strictly on objective intent, but really there is lots of statements in Brouwer, and certainly from the many other Circuit Courts of Appeal that we cite in our brief, that there is some subjective element that is still relevant here. What happened in Brouwer was officers threw up a roadblock to stop a car and everybody in it, and that was their intent. Their intent was to seize everybody in that car and stop it. But the Court also differentiates those facts from what would be what it called an unintended consequence of government action or an accidental effect of a government action, like a hostage or a bystander situation. And respectfully, what opposing counsel is arguing would essentially eliminate all these cases that deal with accidentally hitting a bystander or a hostage when your intent is to shoot at the suspect and stop the suspect. And in fact... Mr. Fieser, let me ask you a question. What do you think Brouwer means when it talks about an unintended person or thing being a subject of a seizure? What sort of circumstance is that? I think it's talking about something that is like what actually happened in that case, which is whoever was in that car, they threw a roadblock to stop everybody in the car. Whether there's a suspect, whether there's everybody else in the car with the suspect, they're trying to stop the car. I think what the Court's differentiating in Brouwer is an accidental action. So if in this case, let's say that the assailant had been able to wrestle the car away from Ms. Cooper and drove it away, and the police all shot at the tires to disable the car, the car flips on its head, and everybody inside is killed, is there a Fourth Amendment seizure? I think that would be a different case. That would bring it much closer to what happened in Brouwer, and there's a few other cases that are cited that deal with roadblocks. And Brenlin is a case. Of course, Brenlin was just a routine traffic stop, but it was stop that car. What if the police were trying to kill the assailant by shooting him, but they were poor marksmen, shot out the tires, the car flips, and everybody dies? Is there a Fourth Amendment seizure? No, and that's where I think that there's a difference between— That's crazy. You're telling me that the subjective—forget subjective. You're telling me that the marksmanship of the police officers determines whether or not in identical results there's a Fourth Amendment seizure. I think there is. What the case law says is that if it's an unintended consequence of a lawful action, That makes no sense. If the Fourth Amendment is supposed to be interpreted on an objective basis, and the Supreme Court has told us that over and over and over again, you're telling me that the identical result in my two hypotheticals turns on whether or not the police officer was a good shot or not. Not for reasonableness purposes. That's a different issue. You may win on reasonableness, but you're telling me there was no seizure at all to begin with based upon what the police officer says he or she was trying to do with the shot. What the case law says is that an unintended or accidental consequence of an officer's action is not a Fourth Amendment seizure. In fact, just last year, this court, 10 months ago, we filed it as a supplemental authority in the Corbett v. Vickers case, actually talked about a circumstance that's exactly like this one. It's on page 29 of the Flip Opinion. They actually say, In the first situation, an officer fires at the robber or escapee and the vehicle in which he is fleeing with the plane of hostage, but the bullet accidentally also hits the unseized plane of hostage, thus raising the issue of whether the bullet striking the plane of hostage constitutes a Fourth Amendment seizure. This factual situation is presented in the Brouwer Dicta, and in cases like Childress, Medeiros, and Landel-Rivera, all indicating there is no Fourth Amendment seizure in that situation. Brouwer doesn't talk about a shooting scenario, right, in Dicta? No, it doesn't. It talks about, as I mentioned, the unintended or accidental consequence of shooting at a suspect. And the other cases that the panel in Corbett was citing all talk about hostage-type situations like we had here. And they all say there wasn't a seizure in that sort of accidental or unintended situation. And so while it is an objective, reasonable, and standard, or objectively, what were the officers' conducts from above reasonable, there is still some willful act of the officer that has to be involved in whether there was a seizure or not. Are you talking about, you know, the word intent has a lot of different connotations. There's general intent. There's specific intent in the sort of tax violation sense. There's willfulness. There's a knowing element to it. What do you think intent means? What do you think intentionally means in the Brouwer sense? I think it means the willful act of the officers. What were they trying to do? And I think in one of the scenarios that you cited, Your Honor, where they're shooting at tires of a car, they're trying to stop that car and everybody in it. And I think that's what Brennan was too. Again, Brennan was a routine thing. It wasn't a sort of a violent act. There was no deadly force. It wasn't that kind of situation, which this court in the previous appeal, in this case eight years ago, differentiated Brennan in that type of case from what we have here. Brennan didn't have anything to do with deadly force. It didn't have anything to do with hostages. It had to do with stop that car. If that's what the willful act was trying to do, then that's what the Fourth Amendment seizure is. Here, this case falls right in line with Corbett and all the other cases that we cite that deal with the hostage that's accidentally struck when the officers are trying to stop the suspect. And so the district court was correct that there was no seizure in this case. I mean, if a seizure is the stopping of someone's movement, how can shooting that person not be a seizure? Because here it was just like many of the other cases. It was the accidental sort of effects of trying to shoot the suspect. The hostage here was accidentally struck by collateral fire, if you will, at the suspect. Every single officer throughout the record of this case testified that they were shooting at the bad guy, who, incidentally, the two main ones that actually shoot at him, thought was shooting at them. Now, they were correct in that, but... I'll turn around Judge Choflat's question to your opponent. He said that Mr. Kuchergis's argument would mean that every time that an innocent bystander or hostage is shot, when the police are trying to hit an assailant, would be a seizure. And so it's an all-or-nothing proposition for seizure purposes. But yours is an all-or-nothing proposition the other way, too. So any time the police say, oh, we were trying to hit the bad guy, no matter what we did, then there's no seizure at all. I think that is the proper analysis of all of the case law throughout the years, including this court's case in Troop. Okay, let me give you one more hypothetical, and then I'll be quiet. Yes, sir. The police have a hostage situation. The hostage is not in front of the assailant, so they're standing side by side. The assailant has a knife but not a gun. And the police, instead of taking a sniper shot or a pistol shot at the assailant, decide to empty a machine gun at the two individuals who are standing next to each other. And not only is the assailant killed, but the hostage is killed, too. Is there a seizure? That sounds to me like that is an intentional act directed toward everybody that's standing there. So potentially in that scenario there would be a seizure, and probably a 14th Amendment shocking the conscience behavior as well. That certainly might rise to that level. How is that different than emptying 40-something shots into a car with an assailant and an innocent hostage? There's no testimony anywhere in the record that any of the officers who actually shot at the car had any idea there was anybody else in that car. She was actually head down in the passenger seat with heavily tinted windows on the car. All they could see was the suspect. They were shooting at the suspect trying to get him to stop. Judge Toklat, it seems to me that in these cases where the plaintiff is in effect being seized initially by the defendant, by the criminal, and that's the way it is, a hostage cannot go anywhere. There's no constitutional violation. That's a fact. A hostage is not going anywhere. And the police arrive. It seems to me that everybody's being seized at that time in classic Fourth Amendment analysis. Nobody is free to leave. I'll put it that way. It's not a parry stop or anything like that. It's just a plain everybody freezes. It seems to me that it's almost impossible to say that the hostage is not, quote, seized. Yes, Your Honor. And actually, that's an interesting point. And the question then becomes whether it's unreasonable. What the officers did, the seizure was not unreasonable. Yes, Your Honor. The seizure itself was not unreasonable. Yes, Your Honor. And they were not shooting in order to effect a seizure. They already had them seized because the place was surrounded. Correct, Your Honor. That's actually the Corbett case from last year. That was a case where everybody was already seized. But one of the children that was actually already seized was accidentally hit by a bullet that was meant for a dog. And the court in that case said there was no liability under the Fourth Amendment. Because we raised them with us. Correct. Not because there was no seizure. Right. That's right. And because what the court said. You could make a technical argument that the seizure initially was not unreasonable. But the firing of the bullet, I don't know what violation that is. Whether it made the seizure unreasonable, I don't know. No, the court said it did not. And what the court said was that the bullet that was directed toward. They used that word directed to the dog. In other words, intended for the dog. Not intended for the child. Accidentally hit the child. That was not a Fourth Amendment constitutional violation of the child's rights. What it is is an excessive force claim against the perpetrator. Yes, Your Honor. I have questions. This is Judge Hall. I have a little bit different interpretation of reading Brower. Because it says, as Judge Jordan points out, a seizure occurs even when an unintended person is the object of the detention. But the detention itself must be willful. And it goes on to talk about that when you have detention, the detention here was the robber detained her. The detention was already in place. She was detained and she couldn't leave because she was a hostage. And so that there was no seizure because the officers weren't trying to seize her. They were trying to shoot the robber. And the detention, to the extent she was in the car, was from the robber. Now, maybe that's not the right analysis. Does the government say that's not the right analysis? The detention was him taking her hostage, and they were trying to shoot him. I'm not getting subjective intent. Nobody doubts that they were trying to shoot him. Sure. And the detention was from the robber. It's not really intentional. In Brower it says it must be a willful act of the gunman to detain her. I would completely agree with that, Your Honor. There's no evidence that the officers had any willful intent to detain Cooper or her child. They were trying to shoot at the suspect. The suspect took her hostage. I would agree with you, Your Honor. I do want to, if I can. I feel like I'm running out of time. I did want to touch on, Your Honor, Judge Hull's question to opposing counsel about what's the basis of the claim against the sheriff. Because I think that is very important. The sheriff is the only defendant aptly left in this case. All the individual officers, as we know, were given qualified immunity in this case, primarily because the court and this court back in 2012 said that in 2010, at the time this event happened, which is over 10 years ago now, there was no clearly established case law that said the number of shots fired and what the officers did to try to detain a fleeing violent felon and not let him get away and try to get him was a constitutional violation. So that's the basis, and that's the basis that the officers got qualified immunity. So how do you get to a claim against the sheriff, as Mr. Katergis says, based on failure to train or maybe not have the proper policies? The only way that you do that is if the sheriff is deliberately indifferent to a specific need to enact policies concerning this type of incident, which we do not have anything in the record that in 2010 this type of incident was in any way common in the city of Jacksonville. In fact, it was utterly unique. It was just a chaotic, crazy, very fast, and we're talking probably from the time the first shot's fired to the time the suspect's dead, under two minutes. We're talking a really fast-moving type of hostage-fleeing felon type thing. There's no evidence that that type of thing commonly occurred in Jacksonville at all. And we know that there was no clearly established constitutional violation here, so there's no way that the sheriff, as a policy matter of the city, can be deliberately indifferent, which is sort of... Did the district court reach that issue, though? The district court did not. The district court said because there's no constitutional violation, I don't got to get into the policies or the training or any of that kind of thing. But all of that is very well developed in the record, and it's very clear. Our policies, the JSO's policies at the time, are absolutely gold-standard policies. They comply. The JSO's is credited nationally and statewide. They train in all of their policies. As the sheriff says and the undersheriff says, they're both of their... The undersheriff's declaration is in the record, and he says, you know, we train above and beyond what the Constitution even requires. We hold our officers really to high standards in how they're trained. So you've got to have it... The sheriff has to be deliberately indifferent to, oh, wow, I need to really train these guys on what to do if I've got a fleeing felon trying to, you know, and holding a hostage and has a gun and all those kinds of things. I've got to be able to train on that. We do have policies in the record. There is a response to resistance policy in the record that talks very specifically. It's in volume four of the appendix, and it's specifically pages 47 through 49, and it's very detailed. This is when you can use deadly force, only if all these three circumstances are present, and this is when you can fire at a moving vehicle when these particular circumstances are present. And it's very, very, very specific, and that's where the training comes in. So you've got to have a really high standard in order to hold the sheriff liable for a constitutional violation for the actions of officers who have all been given qualified immunity. Now, this doesn't determine the issue of municipal policy under Monell, of course, but the sheriff's internal investigation indicated that at least some of the shooting was an unreasonable use of force, right? Correct. Yes. What the sheriff talks about in the internal investigation did, in fact, find that officers Griffith and Black did not comport with JSO policy. Of course, like I just said, that's different than whether they committed a constitutional violation, but it said that they did not follow policy by firing at a vehicle or firing at a suspect when they weren't sure if there might be somebody else in the vehicle or maybe what kind of bystanders were around there. They acted too quickly or they acted improperly under JSO policy. But, again, that shows that the policies are in place, were in place at the time, and that there's units in JSO internal affairs, response resistance that investigate this stuff and make sure that the officers are not engaging in conduct they're not supposed to under JSO's high level of training and policy, that they're acting reasonable and they're consistently subject to discipline for not following those policies or not comporting with those policies, and that's what the sheriff is talking about. The sheriff is recognizing, I think in his memo, talking about this, that there may have been a need for deadly force here. You did have a really scary scenario here with a guy that just committed a bank robbery and may or may not have been firing at the officers, was certainly trying to flee, but what he says is officers Black and Griffin, all the other officers were exonerated completely, including the officer that fired initially, Lieutenant York, was exonerated. But he said that those two officers, under our policies and under our high level, our sort of aspirational high level of training, they did not comport with that. So again, that just proves the point that the sheriff can't be liable for deliberate indifference to something where clearly they were on point here and they were all over this in terms of what their policies needed to be and what needed to happen if those policies were violated. Again, all this is assuming that there was a seizure in the first place, which is where the district court, as Judge Hall mentioned, that's where the district court stopped. You know, he said there wasn't a constitutional violation because they weren't fired. You can finish up, Mr. Peser. Thank you very much. Because the officers were firing at the suspect, none of them even knew, the ones who fired the bullets even knew that there was any hostages in the car at all, and they certainly weren't intending or trying to fire at the hostages or everyone in the car. They were trying to stop the suspect, a violent suspect. So there was no Fourth Amendment violation. But even if there was, the sheriff still can't be liable under some sort of municipal liability theory. And so we would ask for those reasons that you affirm the district court. All right. Thank you very much, Mr. Peser. Thank you very much. If I may briefly, in rebuttal, this is Matt Kaczorokas. I believe that the sheriff's office regarding the intent of the officer dictates whether there's a Fourth Amendment seizure has been squarely foreclosed by Supreme Court. The Supreme Court in Brenlin v. California, in the case in which it analogizes to Brower, and it states on page 261 of the opinion, 551 U.S. 261, if the car, referring in Brower, if the car had had another occupant, it would have made sense to hold that he, too, had been seized when the car collided with the roadblock. Even though the roadblock was intended to stop the driver suspect, anyone else in that vehicle that was subject to law enforcement intentional conduct would have been subject to a seizure. That's the point of Brower reaffirmed by Brenlin. And regarding Corbett, as Judge Jordan well knows, having sat on the panel, in Corbett the case was decided on qualified immunity grounds, finding that there was no clearly established law, not that there was. No, I wasn't on that panel, Mr. Kaczorokas. I apologize. But in Corbett the case was decided on qualified immunity grounds, not whether there was a seizure or not. The seizure had predicated the shooting, and the case was resolved on qualified immunity grounds. For what it's worth, that's up in conference with the Supreme Court, inviting the court to review qualified immunity. Lastly, we do have record evidence that these officers were not just shooting at the bad guy, as the sheriff would contend. We have evidence in the record and testimony from at least two of the officers, one of which is black, stating that he was attempting to prevent the car from moving, attempting to shoot the car. Lieutenant York's final two shots with the shotgun were directed at the tires, trying to prevent the car from moving. So those facts put this case more in line with the Fisher v. City of Memphis case out of the Sixth Circuit that we discussed, that when you attempt to shoot and disable a vehicle and keep it from moving, that you are seizing all the occupants of the vehicle, consistent with the Brenlin opinion. So based upon all of those authorities, we contend when these officers engaged in intentional conduct, to wit, the firing of their weapons, discharging firearms, at that point when those bullets strike an individual through the intentional application of force by the officers, there is a seizure. And based upon that, there's a seizure that requires the court to engage in objective, whether it's objectively unreasonable, and we contend that it was, and further that there was a policy that was the moving force behind not only the Fourth Amendment violation but the 14th as well. So that's our position, and we respectfully request that this court reverse the district court's order granting summary judgment to the sheriff. All right. Thank you both very much. We really appreciate it. Court is in recess for today.